UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALTICE USA, INC., CSC HOLDINGS, LLC, and a4 MEDIA, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>DAVID POWERS, JORDAN LIEBERMAN, LINDA MONTEMAYOR and POWERS INTERACTIVE DIGITAL LLC,<br><br>Defendants. | **C.A. No.** 23-cv-6394<br><br>**COMPLAINT**<br><br><u>**Jury Trial Demanded**</u> |

Plaintiffs Altice USA, Inc. ("Altice USA"), CSC Holdings, LLC ("CSC Holdings"), and a4 Media, LLC ("a4 Media," and together with Altice USA and CSC Holdings, "Plaintiffs" or "Altice"), by their undersigned counsel, as and for their Complaint against defendants David Powers ("Powers"), Jordan Lieberman ("Lieberman"), Linda Montemayor ("Montemayor," and together with Powers and Lieberman, "Individual Defendants") and Powers Interactive Digital LLC ("Powers Interactive," and together with the Individual Defendants, "Defendants"), allege as follows.

<u>**NATURE OF THE ACTION**</u>

1.      In December 2021, Powers—a former Altice executive who was then subject to multiple non-competition and non-solicitation agreements and receiving severance payments from Altice—helped form the eponymous Powers Interactive and launched a scheme to compete with Altice, in violation of his contractual obligations to Altice. In short order, the scheme progressed as Powers and Powers Interactive hired no less than seven other former-Altice employees—including Lieberman and Montemayor—and one former-Altice consultant. These

1

eight individuals all left Altice within six months of the formation of Powers Interactive, even as they too were bound by restrictive covenant agreements.

2.    This carefully orchestrated plan transplanted large swaths of the political advertising and analytics business of Altice to Powers Interactive, completely undermining the contractual obligations of the three Individual Defendants and six other former-Altice employees and consultant ("Other Former-Altice Employees and Consultant").[1] The scheme was also carried out surreptitiously under the cover of numerous misrepresentations and misleading statements made by the Individual Defendants to Altice, to prevent Altice from halting the scheme at the outset.

3.    During the launch and execution of the scheme, the Individual Defendants and the Other Former-Altice Employees and Consultant were *all* subject to restrictive covenant agreements that prohibited them from competing with Altice, soliciting customers or employees of Altice, or disclosing or using the confidential and proprietary information of Altice.

4.    Indeed, each Individual Defendant was subject to more than one such agreement. Thus, the Individual Defendants repeatedly manifested their commitment to refrain from competing against Altice, soliciting customers and employees of Altice, or disclosing or using the confidential and proprietary information of Altice.

5.    Through their formation and operation of Powers Interactive, the Individual Defendants violated their contractual and common law obligations to Altice. They formed Powers Interactive with the intent to compete with the political advertising and analytics

---

[1] The Other Former-Altice Employees and Consultant include: Kate Holliday ("Holliday"), Brandyn Pantano ("Pantano"), John Zimmerman ("Zimmerman"), Stephen Pienciak ("Pienciak"), Peter Ludgin ("Ludgin"), and Richard Schlackman ("Schlackman"). Schlackman is the consultant. *See* ¶¶ 94-135, *infra*.

business of Altice. They built up Powers Interactive by soliciting the Other Former-Altice Employees and Consultant—all of whom were subject to restrictive covenant agreements—to join them. The Individual Defendants also solicited Altice's customers in an effort to convert the customers' business from Altice to Powers Interactive, and tortuously interfered with Altice's contractual relationships by recruiting the Other Former-Altice Employees and Consultant to do the same.

6.      There is no doubt that Powers Interactive and the Individual Defendants have stolen significant business from Altice. Between 2021 and 2022, Altice lost **95%** of its revenue attributable to political opportunities that were handled by the Individual Defendants and the Other Former-Altice Employees and Consultant. Upon information and belief, the Individual Defendants used their knowledge of the preferences and needs of Altice's customers, and other confidential and proprietary information belonging to Altice, in order to compete against Altice, and conscripted the Other Former-Altice Employees and Consultant to do the same.

7.      Powers Interactive and the Individual Defendants also have violated copyrights held by Altice's subsidiary CSC Holdings.

8.      In particular, Powers Interactive has reproduced, distributed, and displayed on its website an Order Terms and Conditions document that is substantially similar to, and a near-verbatim copy of, an Order Terms and Conditions document that Altice has used with its customers, in which CSC Holdings is the owner of a valid copyright ("Altice Order Terms").

9.      Powers Interactive and the Individual Defendants have always known of CSC Holdings' intellectual property rights in this content. The Altice Order Terms are marked as copyright protected and became available to Altice's customers via its website in February 2021. The Individual Defendants secured customers for Altice who agreed to, and whose business with

Altice was governed by, the Altice Order Terms. The document was prepared by in-house counsel at Altice under the supervision of Montemayor, prior to Montemayor's resignation from Altice.

10.    Altice seeks damages caused by the Individual Defendants' breach of their restrictive covenant agreements and specific enforcement of those agreements, as well as damages for Defendants' tortious interference with Altice's contractual relationships and infringement of the Altice Order Terms.

11.    As a result of Defendants' actions, Altice has suffered, and will continue to suffer, damages and irreparable harm, including, but not limited to, the loss of goodwill, and the loss of business, and other damages for which there is no adequate remedy at law.

12.    An order enforcing the full measure of the restrictive covenant obligations owed to Altice is necessary to prevent further harm to Altice caused by the Individual Defendants' unfair and illegal activity which, if it continues unabated, will result in Altice (i) losing the benefit of its bargain with the Individual Defendants and the Other Former-Altice Employees and Consultant; and (ii) losing additional customers and goodwill to which the Individual Defendants and the Other Former-Altice Employees and Consultant had access by virtue of their employment at Altice.

## THE PARTIES

13.    Plaintiff Altice USA is a corporation organized under the laws of the State of Delaware with its principal place of business located at 1 Court Square West, Long Island City, New York.

14.    Plaintiff CSC Holdings is a limited liability company organized under the laws of the State of Delaware with its principal place of business located at 1 Court Square West, Long Island City, New York. It is a wholly-owned subsidiary of Altice.

15.    Plaintiff a4 Media is a limited liability company organized under the laws of the State of Delaware with its principal place of business located at 1 Court Square West, Long Island City, New York. It is a wholly-owned subsidiary of CSC Holdings, and thus Altice.

16.    Upon information and belief, defendant Powers is a resident of Pennsylvania with an address of 208 Mount Carmel Avenue, Glenside, Pennsylvania.

17.    Upon information and belief, defendant Lieberman is a resident of Maryland with an address of 6215 Dahlonega Road, Chevy Chase, Maryland.

18.    Upon information and belief, defendant Montemayor is a resident of Pennsylvania with an address of 920 Swedesford Road, Lower Gwynedd, Pennsylvania.

19.    Upon information and belief, defendant Powers Interactive is an LLC organized under the laws of the State of Delaware with its principal place of business located at 16192 Coastal Highway, Lewes Delaware.

## JURISDICTION AND VENUE

20.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) with respect to Altice's claims brought under the U.S. Copyright Act, 17 U.S.C. § 101 *et seq.*, and pursuant to 28 U.S.C. § 1367 with respect to Altice's claims brought under the laws of the State of New York.

21.    This Court has personal jurisdiction over Defendants pursuant to CPLR 302(a)(1) and CPLR 302(a)(3) because—among other things—Defendants (i) transacted business in New

York or contracted to supply goods or services in New York; and (ii) committed tortious acts outside the State and expected that those acts would have consequences within the State.

22.    In addition, Section 11(b) of Powers' separation agreement, *see* ¶ 53, *infra*, contains a forum selection and jurisdictional consent clause which provides that Powers "irrevocably submits to the jurisdiction of … the federal courts of the United States of America located in the State of New York … and hereby waives … as a defense that [he is] not subject thereto or that the venue thereof may not be appropriate."

23.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c) because a substantial part of the events giving rise this action occurred in this judicial district and Defendants are subject to personal jurisdiction in this judicial district.

### THE FACTS

**A.  The Business of Altice and Acquisition of Audience Partners**

24.    Altice is one of the largest broadband communications and video service providers in the United States, serving nearly five million residential and business customers across twenty-one states with an advanced portfolio of connectivity services, including Optimum Fiber Internet, Optimum TV and Optimum Mobile.

25.    Altice also operates Altice Advanced Advertising & Analytics—known as "a4 Media." a4 Media is an advanced advertising and data business that provides audience-based, multiscreen advertising solutions to local, regional and national businesses and clients.

26.    Altice launched a4 Media in or about April 2018 as the culmination of a series of acquisitions—including the purchase of Audience Partners in or about March 2017. Upon information and belief, at the time of its acquisition by Altice, Audience Partners was the one of

the largest online political advertising network in the country, and was strategically poised to synergize Altice's platform.

27.     Altice's a4 Media offers an array of services in the digital and linear advertising spaces—including, but not limited to, media planning, ad creation, ad execution, analytics, creative design and ancillary consulting services. Altice markets and sells these services across the political, advocacy, and corporate affairs spectrums—among others.

28.     Audience Partners was co-founded in 2008 by Richard Masterson ("Masterson"). Masterson's LinkedIn profile reflects that he is the current Chairman of Powers Interactive and that he has held that role since January 2022.[2]

29.     All three Individual Defendants became employees of Altice through its acquisition of Audience Partners. Three of the Other Former-Altice Employees and Consultant— Zimmerman, Pienciak, and Schlackman—also joined Altice through its acquisition of Audience Partners.

30.     When Altice acquired Audience Partners, it acquired (among other things) any customer contracts, customer lists, customer information, and intellectual property belonging to or held by Audience Partners.

31.     The market for advertising and analytics in which Altice operates—including across the political, advocacy, and corporate affairs spectrums—is highly competitive. Altice is often competing with other companies for the same customers. Altice relies on the relationships it has developed with its existing and prospective customers over the years—and its knowledge of those customers' preferences and utilization—to assist in maintaining and expanding its customer base, and to distinguish itself from the competition.

---

[2] *See* https://www.linkedin.com/in/rimasterson/ (last visited August 8, 2023).

32.      Information regarding customer preferences and utilization is confidential and is only shared with Altice employees and consultants who require the information to perform their job functions, such as executives, directors, managers and account coordinators—in this instance, the Individual Defendants and the Other Former-Altice Employees and Consultant.

33.      Such information includes, but is not limited to, customer contact information; customer spend and payment history; customer billing information, including special packaging and pricing terms; cost per mille[3] rates used and any mid-campaign adjustments; the mix of products used for campaign execution; audience segmentation strategies; media strategies; sources of data used to develop audience segmentation and media strategies; demand-side platform[4] utilization and relationships; and post campaign analytics and reporting. Such information helps Altice provide effective service to clients, and also helps employees and consultants solicit new business and maintain Altice's existing accounts.

**B. The Individual Defendants' Employment With Altice And Restrictive Covenant Obligations**

34.      Each Individual Defendant executed more than one agreement that contains restrictive covenant obligations for the benefit of Altice. As alleged in Subparts 1-3, *see* ¶¶ 35-93, *infra*, through their formation and operation of Powers Interactive, and solicitation of the Other Former-Altice Employees and Consultant, the Individual Defendants have violated their obligations under these agreements.[5]

**(1) Powers**

---

[3] Cost per mille—referred to as "CPM"—is a paid advertising option where the customer pays a price for every 1,000 impressions an ad receives.

[4] Demand-side platform—referred to as "DSP"—is a real-time ad buying platform that connects customers to advertisers such as Altice.

[5] Altice incorporates by reference into its Complaint the agreements referred to in Subparts 1-3, *see* ¶¶ 35-93, *infra*.

35.     Powers became an employee of Altice in or about March 2017 by virtue of its acquisition of Audience Partners. He served as Senior Director of Ad Campaign Management from March 2017 until September 2020. Powers was promoted to Vice President of Product Management in September 2020 and held that position until his separation from Altice on or about July 1, 2021.

36.     Powers had a litany of contacts with New York throughout his employment with Altice. Although he lived in Pennsylvania, Powers traveled to New York and worked from Altice's Long Island City office on a regular basis. In fact, he traveled to New York with such frequency that he maintained an office with his name on the door in the Long Island City office. While in New York, Powers met in person with customers and other employees of Altice.

37.     Regardless of where he physically sat, Powers was in constant contact with employees in Altice's New York offices in furtherance of the company's business, including business that was in-state. Indeed, among other things, Powers was responsible for maintaining and obtaining business for Altice in New York—including certain in-state business which, upon information and belief, Powers Interactive later stole from Altice. On top of that, when Powers accessed Altice's computer systems—and thus its proprietary and confidential information—he connected to servers located in New York. His payroll and benefits were processed through Altice's New York offices.

38.     During his employment with Audience Partners and Altice, Powers executed five agreements that contain restrictive covenant obligations for the benefit of Altice.

39.     On or about November 16, 2016, Powers entered into a Proprietary Information, Inventions, Non-Solicitation and Non-Competition Agreement ("Powers AP Agreement") for the benefit of Audience Partners and its "successors"—i.e., Altice, see ¶¶ 26-30, supra.

9

40.    Section 4 of the Powers AP Agreement restricts Powers from becoming involved with any business that competes with Altice for a period of six months, on the following terms:

> **4. NON-COMPETITION.** I agree that, **during my employment and for a period of six (6) months after my employment with the Company is terminated** by either party, with or without advance notice or cause, I will not, directly or indirectly, compete with the Company by becoming interested (whether as an employee, consultant, advisor, independent contractor, owner, lender, partner, co-venturer, director, officer or otherwise) in any business that is a direct competitor of the Company in North America.
>
> I understand that, for purposes of this Agreement, a business will be "directly competitive" if it is (a) directly competitive with the Company's business as of the date of this Agreement or (b) directly competitive with any other business in which the company subsequently becomes engaged (or I am aware is actively planning to engage) and in respect of which I have been directly engaged in providing services or as to which I otherwise had access to material information …[6]

41.    Section 5 of the Powers AP Agreement restricts Powers from soliciting Altice's customers or employees for a period of twelve months, on the following terms:

> **5. NO SOLICITATION OF EMPLOYEES, CUSTOMERS AND OTHER BUSINESS PARTNERS.** I agree that **during my employment and for a period of twelve (12) months after my employment with the Company is terminated** by either party, with or without advance notice or cause, I shall not, directly or indirectly, either for myself or for the benefit of any other person or entity, do any of the following (or attempt, or assist any other person to do or attempt, any of the following):
>
> (a) solicit, influence, induce, recruit or encourage any actual or potential customer, client, licensor, licensee, strategic partner, vendor, or supplier of the Company to terminate or modify any written or oral agreement or course of dealing with the Company or otherwise to direct its purchase of products or services to a person or entity in competition with the Company's Business; or

---

[6] Emphasis in original.

(b) attempt to negatively influence or otherwise discourage or dissuade any person or entity from purchasing any Company products or services; or

(c) solicit, influence, induce, recruit or encourage any Company employee, consultant, independent contractor, channel partner, broker, or agent to terminate or modify his, her or its service relationship with the Company or to provide services to a person or entity in competition with the Company's Business.[7]

42.    Section 9.2 of the Powers AP Agreement provides that the time period applicable to Powers' obligations under Section 4 (regarding non-competition) and Section 5 (regarding non-solicitation) "shall be extended by a period of time equal to the number of days during which [Powers] is in violation."

43.    Sections 1.1 and 1.2 of the Powers AP Agreement prohibit Powers from disclosing any confidential, proprietary or trade secret information regarding the business and operations of Altice, with such information specified to include, among other things, information relating to the products, services, terms, and current and prospective customers of Altice.

44.    On or about June 25, 2018, Powers executed a Stock Option Award Agreement with Altice ("Powers Stock Option Award Agreement [2018]") that contained restrictive covenant obligations.

45.    Section 11(b) of the Powers Stock Option Award Agreement [2018] restricts Powers from becoming involved with any business that competes with Altice for a period of twelve months, on the following terms:

(b) Non-Competition. The Participant hereby acknowledges and agrees that due to the Participant's position with the Company and its Affiliates and the Participant's knowledge of the Confidential and Proprietary Information (as defined below), the Participant's employment by or affiliation with certain entities would be detrimental to the Company and its Affiliates. The Participant

---

[7] Emphasis in original.

hereby agrees that the Participant has not and will not during the Participant's term of service to the Company and its Affiliates and for a period of 12 months, which period shall commence immediately following the termination of the Participant's service with the Company or its Affiliates for any reason, become employed by, assist, consult to, advise in any manner or have any material interest, directly or indirectly, in any Competitive Entity. A "***Competitive Entity***" shall mean … any person, entity or business that competes with any of the Company's or any of its Affiliate's … advertising … businesses, … as well as such other businesses as the Company and its Affiliates engage in as of the date of termination of Participant's service with the Company or its Affiliates. The Participant's agreement not to compete shall be limited to the geographic area in which the Participant performed work for the Company or its Affiliates at any time …[8]

46.      Section 11(c) of the Powers Stock Option Award Agreement [2018] restricts

Powers from soliciting Altice's employees (among other persons) for a period of twelve months,

on the following terms:

(c) <u>Non-Solicitation</u>. The Participant hereby agrees that the Participant has not and will not during the Participant's term of service to the Company and its Affiliates and for a period of 12 months, which period shall commence immediately following the termination of the Participant's service with the Company or its Affiliates for any reason, solicit, contact or persuade, directly or indirectly (whether for the Participant's own interest or any other person or entity's interest) any employee, consultant or vendor of the Company or its Affiliates to leave the employ of the Company or its Affiliates or to cease or reduce working for and/or doing business with the Company.

47.      On or about January 22, 2020, Powers accepted a second Stock Option Award

Agreement ("Powers Stock Option Award Agreement [2020]") that contained restrictive

covenant obligations.

---

[8] Emphasis in original.

48.     Section 12(c) of the Powers Stock Option Award Agreement [2020] restricts Powers from soliciting Altice's customers and employees (among other persons) for a period of twelve months, on the following terms:

> (c) Non-Solicitation. The Participant hereby agrees that the Participant has not and will not during the Participant's term of service to the Company and its Affiliates and for a period of 12 months, which period shall commence immediately following the termination of the Participant's service with the Company or its Affiliates for any reason, solicit, contact or persuade, directly or indirectly (whether for the Participant's own interest or any other person or entity's interest) any employee, customer (from which the Company received payment or payment-in-kind), consultant or vendor of the Company or its Affiliates to leave the employ of the Company or its Affiliates or to cease or reduce working for and/or doing business with the Company.

49.     On or about January 26, 2021, Powers accepted a third Stock Option Award Agreement ("Powers Stock Option Award Agreement [2021]") that contained restrictive covenant obligations.

50.     Section 12(e) of the Powers Stock Option Award Agreement [2021] restricts Powers from soliciting Altice's customers and employees (among other persons) for a period of twelve months, on the same terms as Section 12(c) in the Powers Stock Option Award Agreement [2020], *see* ¶ 48, *supra*.

51.     Similar to the Powers AP Agreement, *see* ¶ 43, *supra*, Section 12(c) of the Powers Stock Option Award Agreement [2021] prohibits Powers from disclosing any confidential, proprietary or trade secret information regarding the business and operations of Altice, with such information specified to include, among other things, information relating to the products, services, terms, and customers of Altice.

52.     Powers separated from Altice on or about July 1, 2021 as part of a restructuring within a4 Media.

53.    On or about July 19, 2021, Powers executed a separation agreement ("Separation

Agreement") pursuant to which he accepted more than $100,000 in severance payments from

Altice that were paid out over a period of six months and other severance benefits.

54.    The Separation Agreement contained restrictive covenant obligations in

consideration for those severance benefits.

55.    Section 10(c) of the Separation Agreement restricts Powers from becoming

involved with any business that competes with Altice for the time period during which he

receives severance benefits, on the following terms:

> (c) Non-Competition. You further hereby acknowledge and agree that the services rendered by you for the Company are special and unique and that a part of the consideration set forth in this Agreement is in exchange for your promises set forth in this Section 10. You hereby represent, warrant and confirm that, you have not and will not for the period of time during which you are receiving the Severance Benefits under this Agreement, directly or indirectly, become employed by, assist, consult to, advise in any manner or have any material interest in, any Competitive Entity, with which the Participant would hold a role or position similar to any role or position you held with the Company, or for whom you would provide services similar to any role or position you held with the Company, or for who you would provide services similar to those you provided to the Company, during the twenty-four (24) months preceding the Separation Date or in which you would have responsibility for or access to confidential information similar or relevant to that which you had access to during the twenty-four (24 months preceding the Separation Date. A "Competitive Entity" shall mean … any person, entity or business that competes with any of the Company's … advertising … businesses, … as well as such other businesses as the Company engages in as of the Separation Date. Your agreement not to compete is limited to within 100 miles of the office(s), whether home or business, from which you reported, primarily worked or provided substantial services on behalf of the Company during the twenty-four (24) months preceding the Separation Date …

56.     Section 10(d) of the Separation Agreement restricts Powers from soliciting Altice's customers and employees (among other persons) for a period of twelve months, on the following terms:

> (d) Non-Solicitation. You agree not to solicit, contact or persuade, directly or indirectly (whether for your own interest or any other person or entity's interest) any employee, customer (from which the Company received payment or payment-in-kind), consultant or vendor of the Company to leave the employ of the Company or to cease or reduce working for and/or doing business with the Company for one (1) year after the Separation Date [July 1, 2021].

57.     Similar to the Powers AP Agreement and the Powers Stock Option Award Agreement [2021], *see* ¶¶ 43, 51, *supra*, Sections 4 and 10(b) of the Separation Agreement prohibit Powers from disclosing any confidential, proprietary or trade secret information regarding the business and operations of Altice, with such information specified to include, among other things, information relating to the products, services, terms, and customers of Altice.

58.     Altice made severance payments to Powers under the Separation Agreement through February 11, 2022. He received more than $100,000 in severance from Altice.

59.     On March 11, 2022, Altice paid Powers a bonus payment of more than $20,000. Powers negotiated payment of the March 11, 2022 bonus as part of the terms of his separation.

**(2) Lieberman**

60.     Lieberman became an employee of Altice in or about March 2017 by virtue of its acquisition of Audience Partners. He served as Vice President and General Manager of Politics and Public Affairs until his resignation from Altice in February 2022. In that role, he was responsible for developing and maintaining customer relationships within Altice's political advertising and analytics business.

61.     Like Powers, Lieberman had a litany of contacts with New York throughout his employment with Altice. Although he lived in Maryland, Lieberman traveled to New York and worked from Altice's Long Island City office on a regular basis. While in New York, Lieberman met in person with customers and other employees of Altice.

62.     Also like Powers, Lieberman was in regular contact with employees in Altice's New York offices in furtherance of the company's business, including business that was in-state. Lieberman, too, was responsible for maintaining and obtaining business for Altice in New York—including certain in-state business which, upon information and belief, he later helped steal for Powers Interactive. Lieberman also accessed Altice's computer systems—and thus its proprietary and confidential information—by connecting to servers located in New York. His payroll and benefits were processed through Altice's New York offices.

63.     During his employment with Audience Partners and Altice, Lieberman executed four agreements that contain restrictive covenant obligations for the benefit of Altice.

64.     On or about February 23, 2015, Lieberman entered into a Proprietary Information, Inventions, Non-Solicitation and Non-Competition Agreement ("Lieberman AP Agreement") for the benefit of Audience Partners and its "successors"—*i.e.*, Altice, *see* ¶¶ 26-30, *supra*.

65.     Section 4 of the Lieberman AP Agreement restricts Lieberman from becoming involved with any business that competes with Altice for a period of six months, on the following terms:

> **4. NON-COMPETITION.** I agree that, **during my employment and for a period of six (6) months after my employment with the Company is terminated** by either party, with or without advance notice or cause, I will not, directly or indirectly, compete with the Company by becoming interested (whether as an employee, consultant, advisor, independent contractor, owner, lender, partner, co-venturer, director, officer or otherwise) in any business that is competitive with the Company's Business in the Territory.

I understand that, for purposes of this Agreement: The Company's "**Business**" shall include any data-driven digital advertising product or service (including the license of data for data-driven digital advertising purposes), as well as any other business in which the Company has engaged (or I am aware is actively planning to engage) during the last twelve (12) months of my employment. Another business shall be deemed "**competitive**" with the Company's Business if its products or services (i) are of the same general type; (ii) perform similar functions; (iii) compete for the same customers and/or (iv) are used for the same purpose as a product or service that the Company designed, developed, manufactured, marketed, sold or licensed during the term of my employment. "Territory" means any geographic area in which, during the last twelve (12) months of my employment, (a) the Company had customers or otherwise conducted its Business or (b) I was aware the Company was targeting potential customers or actively planning to conduct its business …[9]

66.     Section 5 of the Lieberman AP Agreement restricts Lieberman from soliciting Altice's customers or employees for a period of twelve months, on the same terms as Section 5 of the Powers AP Agreement, *see* ¶ 41.

67.     Section 9.2 of the Lieberman AP Agreement provides that the time period applicable to Lieberman's obligations under Section 4 (regarding non-competition) and Section 5 (regarding non-solicitation) "shall be extended by a period of time equal to the number of days during which [Lieberman] is in violation."

68.     Sections 1.1 and 1.2 of the Lieberman AP Agreement prohibit Lieberman from disclosing any confidential, proprietary or trade secret information regarding the business and operations of Altice, with such information specified to include, among other things, information relating to the products, services, terms, and current and prospective customers of Altice.

---

[9] Emphasis in original.

69.     On or about March 30, 2018, Lieberman accepted a Stock Option Award Agreement ("Lieberman Stock Option Award Agreement [2018]") that contained restrictive covenant obligations.

70.     Section 11(b) of the Lieberman Stock Option Award Agreement [2018] restricts Lieberman from becoming involved with any business that competes with Altice for a period of twelve months, on the same terms as Section 11(b) of the Powers Stock Option Award Agreement [2018], *see* ¶ 45, *supra*.

71.      Section 11(c) of the Lieberman Stock Option Award Agreement [2018] restricts Lieberman from soliciting Altice's employees (among other persons) for a period of twelve months, on the same terms as Section 11(c) of the Powers Stock Option Award Agreement [2018], *see* ¶ 46, *supra*.

72.     On or about January 22, 2020, Lieberman accepted a second Stock Option Award Agreement ("Lieberman Stock Option Award Agreement [2020]") that contained restrictive covenant obligations.

73.     Section 12(b) of the Lieberman Stock Option Award Agreement [2020] restricts Lieberman from becoming involved with any business that competes with Altice for a period of twelve months following his separation, on the following terms:

> (b) Non-Competition. The Participant hereby acknowledges and agrees that due to the Participant's position with the Company and its Affiliates and the Participant's knowledge of the Confidential and Proprietary Information (as defined below), the Participant's employment by or affiliation with certain entities would be detrimental to the Company and its Affiliates. The Participant hereby agrees that the Participant has not and will not during the Participant's term of service to the Company and its Affiliates and for a period of 12 months, which period shall commence immediately following (i) the voluntary termination of the Participant's service with the Company or its Affiliates for any reason, or (ii) the termination of the Participant's employment by

18

the Company for Cause, directly or indirectly, become employed by, assist, consult to, advise in any manner or have any material interest in, any Competitive Entity, with which the Participant would hold a role or position similar to any role or position the Participant held with the Company, or for whom the Participant would provide services similar to those the Participant provided to the Company, during the 24 months preceding the termination of the Participant's service with the Company or in which the Participant would have responsibility for or access to confidential information similar or relevant to that which the Participant had access to during the 24 months preceding the termination of the Participant's service with the Company or its Affiliates. A "*Competitive Entity*" shall mean … any person, entity or business that competes with any of the Company's or any of its Affiliate's … advertising … business, as well as such other businesses as the Company and its Affiliates engage in as of the date of termination of Participant's service with the Company or its Affiliates. The Participant's agreement not to compete shall be limited to within 100 miles of the office(s), whether home or business, from which the Participant reported, primarily worked or provided substantial services on behalf of the Company or its Affiliates during the 24 months preceding the termination of the Participant's service with the Company …[10]

74.    Section 12(c) of the Lieberman Stock Option Award Agreement [2020] restricts Lieberman from soliciting Altice's customers and employees (among other persons) for a period of twelve months, on the same terms as Section 12(c) of the Powers Stock Option Award Agreement [2020], *see* ¶ 48, *supra*.

75.    On or about January 26, 2021, Lieberman accepted a third Stock Option Award Agreement ("Lieberman Stock Option Award Agreement [2021]") that contained the same non-competition and non-solicitation obligations as the Lieberman Stock Option Award Agreement [2020], *see* ¶¶ 73-74, *supra*.

76.    Section 12(c) of the Lieberman Stock Option Award Agreement [2021] prohibits Lieberman from disclosing any confidential, proprietary or trade secret information regarding the

---

[10] Emphasis in original.

business and operations of Altice, with such information specified to include, among other things, information relating to the products, services, terms, and customers of Altice.

**(3) Montemayor**

77.    Montemayor became an employee of Altice in or about March 2017 by virtue of its acquisition of Audience Partners. She served as Vice President of Legal and operated in a legal and business advisory role until her resignation from Altice in March 2022.

78.    Like Powers and Lieberman, Montemayor had numerous contacts with New York throughout her employment with Altice. Although she lived in Pennsylvania, Montemayor traveled to New York and worked from Altice's Long Island City office on a regular basis. While in New York, she met in person with other employees of Altice.

79.    Also like Powers and Lieberman, Montemayor was in regular contact with employees in Altice's New York offices in furtherance of the company's business, including business that was in-state. Among other things, Montemayor was responsible for advising Altice on its in-state business operations and on contracts with its employees, customers and others that were governed by New York law. Montemayor also accessed Altice's computer systems—and thus its confidential information—by connecting to servers located in New York. Her payroll and benefits were processed through Altice's New York offices.

80.    During her employment with Audience Partners and Altice, Montemayor executed four agreements that contain restrictive covenant obligations for the benefit of Altice.

81.    On or about November 22, 2016, Montemayor entered into a Proprietary Information, Inventions, Non-Solicitation and Non-Competition Agreement ("Montemayor AP Agreement") for the benefit of Audience Partners and its "successors"—*i.e.*, Altice, *see* ¶¶ 26-30, *supra*.

82.    Section 4 of the Montemayor AP Agreement restricts Montemayor from becoming involved with any business that competes with Altice for a period of six months, on the following terms:

> **4. NON-COMPETITION.** I agree that, **during my employment and for a period of six (6) months after my employment with the Company is terminated** by either party, with or without advance notice or cause, I will not, directly or indirectly, compete with the Company by becoming interested (whether as an employee, consultant, advisor, independent contractor, owner, lender, partner, co-venturer, director, officer or otherwise) in any business that is competitive with the Company's Business in the Territory.
>
> I understand that, for purposes of this Agreement: (A) the Company's "**Business**" shall include any data-driven digital advertising product or service (which shall be deemed to include the license of data for data-driven digital advertising purposes), as well as any other business in which the Company has engaged (or I am aware is actively planning to engage) and in respect of which I have been directly engaged in providing services, or as to which I otherwise had access to material information during the last twelve (12) months of my employment; (B) another business shall be deemed "**competitive**" with the Company's Business if its products or services include data-driven digital advertising products or services that (i) are of the same general type, (ii) perform similar functions, (iii) compete for the same customers and/or (iv) are used for the same purpose as a product or service that the Company designed, developed, manufactured, marketed, sold or licensed during the term of my employment; and (C) "**Territory**" means North America …[11]

83.    Section 5 of the Montemayor AP Agreement restricts Montemayor from soliciting Altice's customers or employees for a period of twelve months, on the same terms as Section 5 of the Powers AP Agreement, *see* ¶ 41.

84.    Section 9.2 of the Montemayor AP Agreement provides that the time period applicable to Montemayor's obligations under Section 4 (regarding non-competition) and

---

[11] Emphasis in original.

Section 5 (regarding non-solicitation) "shall be extended by a period of time equal to the number of days during which [Montemayor] is in violation."

85.     Sections 1.1 and 1.2 of the Montemayor AP Agreement prohibit Montemayor from disclosing any confidential, proprietary or trade secret information regarding the business and operations of Altice, with such information specified to include, among other things, information relating to the products, services, terms, and current and prospective customers of Altice.

86.     On or about June 10, 2019, Montemayor accepted a Stock Option Award Agreement ("Montemayor Stock Option Award Agreement [2019]") that contained restrictive covenant obligations.

87.     Section 12(b) of the Montemayor Stock Option Award Agreement [2019] restricts Montemayor from becoming involved with any business that competes with Altice for a period of twelve months, on the same terms as Section 12(b) of the Lieberman Stock Option Award Agreement [2020], *see* ¶ 73, *supra*.

88.      Section 12(c) of the Montemayor Stock Option Award Agreement [2019] restricts Montemayor from soliciting Altice's customers and employees (among other persons) for a period of twelve months, on the same terms as Section 12(c) of the Powers Stock Option Award Agreement [2020], *see* ¶ 48, *supra*:

89.     On or about January 27, 2020, Montemayor accepted a second Stock Option Award Agreement ("Montemayor Stock Option Award Agreement [2020]") that contained the same non-competition and non-solicitation obligations as the Montemayor Stock Option Award Agreement [2019], *see* ¶¶ 87-88, *supra*.

90.     On or about February 3, 2021, Montemayor accepted a third Stock Option Award Agreement ("Montemayor Stock Option Award Agreement [2021]") that contained restrictive covenant obligations.

91.     Section 12(b) of the Montemayor Stock Option Award Agreement [2021] restricts Montemayor from becoming involved with any business that competes with Altice for a period of twelve months, on the same terms as Section 12(b) of the Lieberman Stock Option Award Agreement [2020], *see* ¶ 73, *supra*.

92.     Section 12(e) of the Montemayor Stock Option Award Agreement [2021] restricts Montemayor from soliciting Altice's customers and employees (among other persons) for a period of twelve months, on the same terms as Section 12(e) of the Powers Stock Option Award Agreement [2021], *see* ¶ 50, *supra*.

93.     Section 12(c) of the Montemayor Stock Option Award Agreement [2021] prohibits Montemayor from disclosing any confidential, proprietary or trade secret information regarding the business and operations of Altice, with such information specified to include, among other things, information relating to the products, services, terms, and customers of Altice.

C.  **The Other Former-Altice Employees and Consultant's Employment With Altice And Restrictive Covenant Obligations**

94.     Like the Individual Defendants, the Other Former-Altice Employees and Consultant are subject to one or more restrictive covenant agreements for the benefit of Altice. Through their work on behalf of Powers Interactive, the Other Former-Altice Employees and Consultants have violated their obligations under those agreements.

**(1) Schlackman**

95.     Schlackman became a consultant for Altice in or about March 2017. He had been a consultant for Audience Partners since November 2012. By virtue of its acquisition of Audience Partners, Altice succeeded to Audience Partners' operative consulting agreement with Schlackman—which had been executed on or about January 1, 2017.

96.     During his time as a consultant for Audience Partners and Altice, Schlackman executed two restrictive covenant agreements for the benefit of Altice.

97.     On or about January 1, 2017, in connection with the execution of the consulting agreement to which Altice succeeded, Schlackman entered into a Proprietary Information, Inventions, Non-Solicitation and Non-Competition Agreement ("Schlackman AP Agreement") for the benefit of Audience Partners and its "successors."

98.     Section 5 of the Schlackman AP Agreement restricts Schlackman from soliciting Altice's customers or employees for a period of twelve months, on the same terms as Section 5 of the Powers AP Agreement, *see* ¶ 41.

99.     Section 9.2 of the Schlackman AP Agreement provides that the time period applicable to Schlackman's obligations under Section 5 "shall be extended by a period of time equal to the number of days during which [Schlackman] is in violation."

100.    Sections 1.1 and 1.2 of the Schlackman AP Agreement prohibit Schlackman from disclosing any confidential, proprietary or trade secret information regarding the business and operations of Altice, with such information specified to include, among other things, information relating to the products, services, terms, and current and prospective customers of Altice.

101.    Schlackman terminated his consulting relationship with Altice in or about mid-May 2022. Schlackman and Altice executed a termination agreement ("Schlackman Termination Agreement") effective May 31, 2022, pursuant to which Altice agreed to continue to pay

Schlackman sales commission on a lucrative Altice customer account for another six months—through December 31, 2022.

102.   Section 4 of the Schlackman Termination Agreement restricts Schlackman from interfering with Altice's relationships with its customers for a period of two years, on the following terms:

> **4. <u>Non-Interference</u>.** Consultant hereby agrees that for a period of two (2) years commencing on the Termination Date, Consultant will not, directly or indirectly, for the benefit of Consultant or any other person or entity encourage, or induce any existing customer of a4 Media to terminate its relationship (contractual or otherwise) with a4 Media (in whole or in part).

103.   Section 5 of the Schlackman Termination Agreement prohibit Schlackman from disclosing any information that is confidential or proprietary information to Altice or its customers, including information that Schlackman "prepared or created" during his engagement with Altice.

104.   Section 7 of the Schlackman Termination Agreement provides that the agreement "shall governed by, and construed in accordance with, the laws of the State of New York[.]"

105.   Pursuant to the Termination Agreement, Altice paid Schlackman sales commissions on the lucrative customer account described in ¶ 101, *supra*. From May 31 through December 31, 2022, Schlackman received more than $38,000 in sales commissions.

**(2) Ludgin**

106.   Ludgin became an employee of Altice in or about March 2017 by virtue of its acquisition of Audience Partners. He served as Senior Director of Advocacy and Public Affairs until his resignation from Altice in February 2022.

107.   On or about January 8, 2015, Ludgin entered into a Proprietary Information, Inventions, Non-Solicitation and Non-Competition Agreement ("Ludgin AP Agreement") for the

benefit of Audience Partners and its "successors"—*i.e.*, Altice, *see* ¶¶ 26-30, *supra*. Upon information and belief, Ludgin executed the Ludgin AP Agreement in connection with his hiring.

108.    Section 4 of the Ludgin AP Agreement restricts Ludgin from becoming involved with any business that competes with Altice for a period of six months, on the same terms as Section 4 of the Lieberman AP Agreement, *see* ¶ 65.

109.    Section 5 of the Ludgin AP Agreement restricts Ludgin from soliciting Altice's customers or employees for a period of twelve months, on the same terms as Section 5 of the Powers AP Agreement, *see* ¶ 41.

110.    Section 9.2 of the Ludgin AP Agreement provides that the time period applicable to Ludgin's obligations under Section 4 (regarding non-competition) and Section 5 (regarding non-solicitation) "shall be extended by a period of time equal to the number of days during which [Ludgin] is in violation."

111.    Sections 1.1 and 1.2 of the Ludgin AP Agreement prohibit Ludgin from disclosing any confidential, proprietary or trade secret information regarding the business and operations of Altice, with such information specified to include, among other things, information relating to the products, services, terms, and current and prospective customers of Altice.

### (3) Zimmerman

112.    Zimmerman became an employee of Altice in or about March 2017 by virtue of its acquisition of Audience Partners. He served as Senior Account Manager from March 2017 until December 2018. Zimmerman was promoted to Manager of Client Services in December 2018 and held that position until his resignation from Altice in January 2022.

113.    On or about July 3, 2015, Zimmerman entered into a Proprietary Information, Inventions, Non-Solicitation and Non-Competition Agreement ("Zimmerman AP Agreement")

26

for the benefit of Audience Partners and its "successors"—*i.e.*, Altice, *see* ¶¶ 26-30, *supra*. Upon information and belief, Zimmerman executed the Zimmerman AP Agreement in connection with his hiring.

114. Section 4 of the Zimmerman AP Agreement restricts Zimmerman from becoming involved with any business that competes with Altice for a period of six months, on the same terms as Section 4 of the Montemayor AP Agreement.

115. Section 5 of the Zimmerman AP Agreement restricts Zimmerman from soliciting Altice's customers or employees for a period of twelve months, on the same terms as Section 5 of the Powers AP Agreement, *see* ¶ 41.

116. Section 9.2 of the Zimmerman AP Agreement provides that the time period applicable to Zimmerman's obligations under Section 4 (regarding non-competition) and Section 5 (regarding non-solicitation) "shall be extended by a period of time equal to the number of days during which [Zimmerman] is in violation."

117. Sections 1.1 and 1.2 of the Zimmerman AP Agreement prohibit Zimmerman from disclosing any confidential, proprietary or trade secret information regarding the business and operations of Altice, with such information specified to include, among other things, information relating to the products, services, terms, and current and prospective customers of Altice.

**(4) Pienciak**

118. Pienciak became an employee of Altice in or about July 2018—after the acquisition of Audience Partners. He served as an Account Manager until November 2019 and during the course of his employment was entrusted with significant responsibilities, including managing Altice's media planning platform, Athena Political, which he maintained until his resignation from Altice in February 2022.

119.    On July 7, 2018, in connection with his hiring, Pienciak executed a Proprietary Information, Inventions, Non-Solicitation, and Non-Competition Agreement for the benefit of Audience Partners and its "affiliates," which is defined to include Altice ("Pienciak Restrictive Covenant Agreement").

120.    Section 4 of the Pienciak Restrictive Covenant Agreement restricts Pienciak from becoming involved with any business that competes with Altice for a period of six months, on the same terms as Section 4 of the Montemayor AP Agreement, *see* ¶ 82, *supra*.

121.    Section 5 of the Pienciak Restrictive Covenant Agreement restricts Pienciak from soliciting Altice's customers or employees for a period of twelve months, on the same terms as Section 5 of the Powers AP Agreement, *see* ¶ 41.

122.    Section 9.2 of the Pienciak Restrictive Covenant Agreement provides that the time period applicable to Pienciak's obligations under Section 4 (regarding non-competition) and Section 5 (regarding non-solicitation) "shall be extended by a period of time equal to the number of days during which [Pienciak] is in violation."

123.    Sections 1.1 and 1.2 of the Pienciak Restrictive Covenant Agreement prohibit Pienciak from disclosing any confidential, proprietary or trade secret information regarding the business and operations of Altice, with such information specified to include, among other things, information relating to the products, services, terms, and current and prospective customers of Altice.

**(5) Holliday**

124.    Holliday became an employee of Altice in or about May 2019—after the acquisition of Audience Partners. She served as Director of Emerging Channels and Technology until her abrupt resignation from Altice on December 31, 2021, *see* Subpart D, ¶ 142-45, *infra*.

125.    During her employment with Altice, Holliday executed two agreements that contain restrictive covenant obligations.

126.    On May 3, 2019, in connection with her hiring, Holliday executed an Employee Restrictive Covenant Agreement for the benefit of Altice ("Holliday Restrictive Covenant Agreement").

127.    Section 1 of the Holliday Restrictive Covenant Agreement restricts Holliday from soliciting Altice's customers and employees (among other persons) for a period of twelve months, on the following terms:

> I hereby agree that I will not, during my employment or other service to Altice USA and for a period of 12 months thereafter (which portion shall commence immediately following the termination of my service with Altice USA for any reason), either alone or with others, director or indirectly (whether for my own interest or any other person or entity's interest:
>
> (a) solicit, persuade, or encourage any actual or potential customer, client, licensor, licensee, strategic partner, vendor, or supplier of the Company, to terminate or modify any written or oral agreement or course of dealing with the Company or otherwise to direct its purchase of products or services to any Competitive Entity, as defined below; or
>
> (b) attempt to negatively influence or otherwise discourage or dissuade any person or entity from purchasing any Company products or services; or
>
> (c) solicit, persuade, or encourage any Company employee, consultant, independent contractor, channel partner, broker, or agent of the Company at any time during the six (6) month period prior to an act, or attempt, to solicit such person or entity, to terminate or modify his, her or its service relationship with the Company or to provide services to any Competitive Entity, as defined below.
>
> A "Competitive Entity" shall mean … any person, entity or business that competes with any of the Company's or any of its Affiliates' … advertising … businesses, … as well as other businesses with which you have been directly engaged in

> providing services or as to which you otherwise had access to material information during the last twelve (12) months of your employment or other service with the Company.

128.    On or about March 15, 2021, Holliday accepted a Stock Option Award Agreement ("Holliday Stock Option Award Agreement") that contained restrictive covenant obligations.

129.    Section 12(b) of the Holliday Stock Option Award Agreement restricts Holliday from becoming involved with any business that competes with Altice for a period of twelve months, on the same terms as Section 12(b) of the Lieberman [2020] Stock Option Award Agreement.

130.    Section 12(e) of the Holliday Stock Option Award Agreement restricts Holliday from soliciting Altice's customers and employees (among other persons) for a period of twelve months, on the same terms as Section 12(e) in the Powers Stock Option Award Agreement [2021], *see* ¶ 50, *supra*.

131.    Section 12(c) of the Holliday Stock Option Award Agreement prohibits Holliday from disclosing any confidential, proprietary or trade secret information regarding the business and operations of Altice, with such information specified to include, among other things, information relating to the products, services, terms, and customers of Altice.

**(6) Pantano**

132.    Pantano became an employee of Altice in or about August 2019—after the acquisition of Audience Partners. He served as an Account Coordinator until April 2020, when he was promoted to Senior Account Coordinator. Pantano held that title until his resignation from Altice in January 2022, *see* Subpart D, ¶ 146-47, *infra*.

133.    On July 9, 2019, in connection with his hiring, Pantano executed an Employee Restrictive Covenant Agreement for the benefit of Altice ("Pantano Restrictive Covenant Agreement").

134.    Section 1 of the Pantano Restrictive Covenant Agreement restricts Pantano from soliciting Altice's customers and employees (among other persons) for a period of twelve months, on the same terms as the Holliday Restrictive Covenant Agreement, *see* ¶ 127, *supra*.

135.    Altice expends substantial resources to develop relationships of trust with its customers and prospective customers. As noted, *see* ¶ 31, *supra*, those relationships are essential to Altice in maintaining and expanding its advertising and analytics business. It is thus vital that Altice be given a sufficient amount of time to prevent former employees from interfering with those relationships—whether by obtaining employment with a competitor or by soliciting employees, customers or prospective customers of Altice.

**D.  Defendants' Formation of Powers Interactive as Competitor to Altice and Solicitation of The Other Former-Altice Employees and Consultant**

136.    Upon information and belief, the Individual Defendants—Powers, Lieberman and Montemayor—formed a plan to create Powers Interactive as a competitor to Altice at or around the time of Powers' departure from Altice in July 2021.

137.    On or about December 8, 2021—while Powers was receiving severance payments and benefits from Altice and still subject to non-competition obligations under multiple agreements—he helped form the Powers Interactive entity for the purpose of competing with the advertising and analytics business that Altice had created after its acquisition of Audience Partners.

138.    Upon information and belief, Powers collaborated on the formation of Powers Interactive with the Individual Defendants and with Masterson, the co-founder of Audience Partners who sold that business to Altice and now serves as Chairman of Powers Interactive.

139.    Also beginning in December 2021, Powers and Powers Interactive began to solicit the Individual Defendants, and the Individual Defendants began to solicit one another and the Other Former-Altice Employees and Consultant, to join the newly formed company. This conduct violated the Individual Defendants' non-solicitation obligations to Altice and tortuously interfered with Altice's contractual relationships with the Other Former-Altice Employees and Consultant, who were also bound by restrictive covenant agreements.

140.    In the six month period following the creation of Powers Interactive—that is, from December 2021 to May 2022—Holliday, Pantano, Zimmerman, Pienciak, Lieberman, Ludgin, Montemayor, and Schlackman all announced their resignations from Altice. In more than one instance, the resignations occurred on the same dates.

141.    Upon information and belief, they each resigned with the intention of joining Powers at Powers Interactive, but lied, and did not disclose their scheme to Altice.

142.    On December 31, 2021, Holliday resigned from Altice abruptly and without notice. Upon information and belief, her intention at the time of her resignation was to join Powers and, ultimately, the other Individual Defendants at Powers Interactive.

143.    However, to create the *appearance* of compliance with her contractual obligations, Holliday became employed at an entity called FourthWall Media, Inc. ("FourthWall") for twelve months.

144.    Holliday resigned from FourthWall in January 2023 and joined Powers Interactive, as Vice President of Politics & Public Affairs—the near equivalent to the title she held at Altice.

145.    Upon information and belief, Holliday in fact began working on behalf of Powers Interactive in 2022, within the period of her non-competition and non-solicitation obligations to Altice, *see* ¶¶ 126-30, *supra*.

146.    Pantano and Zimmerman both resigned from Altice on January 7, 2022.

147.    In his exit interview, Pantano told Altice that he had accepted a position at another company, but did not reveal where. His LinkedIn profile now reflects that he began working as Senior Account Manager at Powers Interactive in February 2022, within the twelve month period of his non-solicitation obligation, *see* ¶ 134, *supra*.[12]

148.    Zimmerman did not respond to Altice's request for an exit interview and gave Altice no indication as to where he was going. His LinkedIn profile now reflects that he began working at Powers Interactive as the Director of Client Success in July 2022, within the twelve month period of his non-solicitation obligation, *see* ¶ 115, *supra*.[13]

149.    Upon information and belief, Zimmerman in fact began working on behalf of Powers Interactive *prior* to July 2022, within the six month period of his non-competition obligation, *see* ¶ 114.

150.    Pienciak resigned from Altice on February 4, 2022.

---

[12] *See* https://www.linkedin.com/in/brandyn-pantano/ (last visited August 8, 2023).

[13] *See* https://www.linkedin.com/in/jack-zimmerman-5a82b5b/ (last visited August 8, 2023).

151.     In his exit interview, Pienciak claimed that he had resigned from Altice with no job lined up. Upon information and belief, that was false, and Pienciak planned to join Powers and the other Individual Defendants at Powers Interactive.

152.     Pienciak's LinkedIn profile now reflects that he began working at Powers Interactive as Senior Account Executive in August 2022, within the twelve month period of his non-solicitation obligation, *see* ¶ 121, *supra*.[14] Moreover, upon information and belief, Pienciak in fact began working on behalf of Powers Interactive *prior* to August 2022, within the six month period of his non-competition obligation, *see* ¶ 120.

153.     Lieberman and Ludgin both resigned from Altice on February 11, 2022.

154.     Upon his resignation, Lieberman told Altice that he had accepted a consulting job and was considering relocating to Florida. That was false on many levels. That same month, Lieberman, like Holliday before him, joined FourthWall where he incubated for twelve months in order to create the appearance of compliance with his contractual obligations to Altice. Like Holliday, he resigned from FourthWall in the anniversary month of his hiring. He joined Powers Interactive as Chief Executive Officer in February 2023.

155.     Upon information and belief, Lieberman's intention at the time of his resignation from Altice was to join Powers and the other Individual Defendants at Powers Interactive. Upon information and belief, Lieberman in fact began working on behalf of Powers Interactive within the period of his non-competition and non-solicitation obligations to Altice, *see* ¶¶ 65-75, *supra*. Indeed, upon information and belief, Lieberman began working on behalf of Powers Interactive *prior* to his resignation from Altice, in that he helped develop the plan to form Powers

---

[14] *See* https://www.linkedin.com/in/spienciak/ (last visited August 8, 2023).

Interactive and began to solicit others—including the Other Former-Altice Employees and Consultant—to join the company.

156.    Similar to Pantano, Ludgin claimed in his exit interview that he had resigned from Altice with no job lined up. He further claimed that he planned to go "back to his roots" in lobbying. Upon information and belief, both claims were false, and Ludgin planned to join Powers and the other Individual Defendants at Powers Interactive.

157.    Ludgin's LinkedIn profile now reflects that he began working at Powers Interactive in Partner Solutions in 2022, and conspicuously does not specify the month.[15] Upon information and belief, Ludgin began working on behalf of Powers Interactive with the period of his non-competition and non-solicitation obligations, *see* ¶¶ 108-110, *supra*.

158.    Montemayor resigned from Altice on March 11, 2022.

159.    Upon her resignation, Montemayor told Altice that she had accepted a job at a "startup" with individuals with whom she "used to work." She intentionally omitted that the "startup" was Powers Interactive—which was already competing with Altice, *see* ¶ 165, *infra*—and the "individuals" were Powers and the other Individual Defendants.

160.    Montemayor's LinkedIn profile now reflects that she began working at Powers Interactive as Chief Legal and Operating Officer in March 2022—the same month as her resignation from Altice and within the period of her non-competition and non-solicitation obligations, *see* ¶¶ 81-93, *supra*.[16] Montemayor did not update her LinkedIn until March *2023*, even though she began working at Powers Interactive twelve months prior.

---

[15] *See* https://www.linkedin.com/in/peterludgin/ (last visited August 8, 2023).

[16] *See* https://www.linkedin.com/in/linda-f-montemayor-855496aa/ (last visited August 8, 2023).

161.    Upon information and belief, Montemayor was surreptitiously advising Powers Interactive and the Individual Defendants on matters related to the competitive business of Powers Interactive while Montemayor was still employed by Altice.

162.    Also upon information and belief, Montemayor was surreptitiously advising the Individual Defendants and the Other Former-Altice Employees and Consultant on matters related to their contractual obligations to Altice while Montemayor was still employed by Altice and encouraging those individuals to resign from Altice and join Powers Interactive.

163.    Montemayor did not disclose her involvement with Powers Interactive to Altice.

164.    Schlackman abruptly ended his consulting agreement with Altice in or about mid-May 2022, without affording Altice the notice required under the agreement for a termination without cause. Upon information and belief, Schlackman entered into a consulting relationship with Powers Interactive prior to terminating his consulting relationship with Altice.

**E. Defendants' Solicitation of Potential and Actual Altice Customers**

165.    Public campaign finance data reflects that Powers Interactive began receiving payments from political campaigns in the United States for its advertising and analytics services as early as February 2022, in competition with the advertising and analytics business of Altice. Upon information and belief, Powers Interactive began competing with Altice prior to February 2022 under the leadership of, and with assistance from, the Individual Defendants.

166.    Upon information and belief, the Individual Defendants solicited potential and actual Altice customers in an effort to convert the customers' business from Altice to Powers Interactive and recruited the Other Former-Altice Employees and Consultant to do the same.

167.    Indeed, there is ample evidence that Powers Interactive and the Individual Defendants stole significant business from Altice—including in New York.

168.     Between fiscal year 2021 and fiscal year 2022, Altice's revenue from political opportunities managed by the Individual Defendants and the Other Former-Altice Employees and Consultant declined by 95%. That dramatic drop-off coincided with the creation of Powers Interactive and mass exodus of the Individual Defendants and Other Former-Altice Employees and Consultant.

169.     Upon information and belief, most—if not all—of that lost business now sits with Powers Interactive. A portion of that lost business represents agency and individual accounts that purchased advertising services from Altice for New York State or local campaigns.

170.     To that point, Altice is aware of at least four agency accounts that did significant business with Altice in election year 2020 and far less business (or no business) with Altice in election year 2022—after the formation of Powers Interactive and coordinated resignations of the Individual Defendants and Other Former-Altice Employees and Consultant. Those four agency accounts were managed or worked on by Lieberman, Schlackman, Pantano, and Pienciak.

171.     Upon information and belief, all four agency accounts are now working with Powers Interactive and some have been doing so since at least January 2022. Indeed, in 2022, the agency account that was managed by Lieberman during his time at Altice and won an award with Powers Interactive for collaboration on a campaign that represents business stolen from Altice.

172.     Altice is also aware of at least three individual accounts that did business with the Altice prior to the formation of Powers Interactive and have since made significant payments to Powers Interactive. In particular, a campaign for a California state assemblyman made payments to Powers Interactive in April, September and October 2022 totaling $152,000. A political action committee ("PAC") representing a coalition of California employees made a payment to Powers Interactive in October 2022 of $126,000. Another PAC representing a coalition of Arizona and

Indiana parents, guardians, teachers and students made payments to Powers Interactive in September and October 2022 totaling $355,000.

173.   Schlackman was responsible for managing the campaign account on behalf of Altice and Pienciak was responsible for managing both PAC accounts. Upon information and belief, Powers Interactive began soliciting the business of these accounts long before the payments alleged in ¶ 172 were made.

174.   Additionally, in or about May 2023, Schlackman and Pienciak met with the Altice customer identified in the Schlackman Termination Agreement—i.e., the customer with respect to which Schlackman continued to receive commission payments from Altice through December 2022. That customer reported to Altice that Schlackman and Pienciak attempted to convert the customer's business from Altice to Powers Interactive.

175.   By virtue of their employment with Altice, the Individual Defendants and the Other Former-Altice Employees and Consultant forged relationships with these and the numerous other customers they serviced on behalf of Altice. Those relationships enabled the Individual Defendants and Other Former-Altice Employees and Consultant to understand the needs of the customers and how Altice—or a competitor of Altice, like Powers Interactive—can best solicit the customers in terms of maintaining existing business and expanding the services offered.

**F. Defendants' Misappropriation of Altice's Confidential and Propriety Information And Infringement of Altice's Copyrighted Order Form**

176.   Upon information and belief, the Individual Defendants have used, and continue to use, confidential and proprietary information relating to Altice's prospective and current customers in order to compete with Altice—including, but not limited to, information related to

customer preferences, utilization, and even customer contracts—and have solicited the Other Former-Altice Employees and Consultant to do the same.

177.    In addition to the confidential and proprietary information identified in ¶¶ 6, 32, 33, 176, *supra*, the Individual Defendants and the Other Former-Altice Employees and Consultant had access to negotiated contracts with third parties, including customers and data vendors. As a result, they were privy to, among other confidential terms, the permitted uses of data and data license fees.

178.    In her role as corporate counsel for Altice, Montemayor, in particular, had access to all contracts that govern the way in which Altice structures data flows—including, but not limited to, contracts with customers, data vendors, DSPs, *see* ¶ 33 n. 4, *supra*, and service providers.

179.    Now—as Altice has recently discovered—Powers Interactive is displaying on its website and distributing to its customers an Order Terms and Conditions document that is the near verbatim copy of the Altice Order Terms.

180.    The website of Powers Interactive states that the "Revision Date" for its pilfered Order Terms and Conditions document is December 21, 2021. Thus, upon information and belief, the Individual Defendants have been using the document to compete with Altice (in violation of their restrictive covenant agreements, no less) for as long as they have been conducting business on behalf of Powers Interactive.[17]

181.    Like the copyright protected work from which it was derived, Defendants' pilfered Order Terms and Conditions document states that it is governed by the laws of the State of New York.

---

[17] *See* https://www.powersinteractive.com/order-terms (last visited August 25, 2023).

182.   Defendants have been on actual notice and had knowledge of CSC Holdings' prior intellectual property rights in its Copyrighted Terms since the publication of the document in February 2021. Indeed, the Altice Order Terms were prepared by an Altice in-house counsel who worked out of the company's Long Island City office under the supervision of Montemayor, while Montemayor was employed by Altice. The Individual Defendants also used the Altice Order Terms with Altice customers.

183.   In order to create the Altice Order Terms, the Altice in-house counsel reviewed and synthetized other order terms and conditions forms that had been used by Altice and collaborated with employees in Altice's advertising and analytics business to arrive at revised terms and conditions that best served the needs of Altice and its customers.

184.   Montemayor approved the final form of the Altice Order Terms on behalf of Altice. At Montemayor's instruction, the Altice Order Terms were published on or about February 8, 2021—with a copyright mark affixed—to a website that Altice made available to its employees and customers.

185.   Upon information and belief, one or more of the Individual Defendants or Former Altice Employees and Consultant accessed the Altice Order Terms on or before December 21, 2021 with the intent to use the document in furtherance of the competitive business of Powers Interactive.

186.   A true copy of the U.S. Registration certificate for the Altice Order Terms and the document itself are attached to this Complaint as Exhibit 1.

187.   Upon information and belief, Defendants have used the Altice Order Terms to secure business for Powers Interactive—including, but not limited to, in-state business for which Powers Interactive and Altice compete. The Individual Defendants knew of the origin of the

Altice Order Terms and nonetheless authorized, and participated in, the infringement of the document.

188.   Upon information and belief, the Individual Defendants stole additional documents and information belonging to Altice, and are now using the documents and information to advance the competitive business of Powers Interactive.

189.   In sum, the Individual Defendants gained valuable insights into the advertising business and processes of Altice during their tenure as executives within a4 Media. Not only did they receive attractive salaries and benefits, they capitalized on their position inside a public company to promote their own profile and collect information—all of which is confidential and proprietary to Altice—as to what makes the company successful. To that point, Altice supplied the multidisciplinary corporate infrastructure and the regulatory, tax, privacy, and corporate compliance protocols and mechanisms that the Individual Defendants are now using to run a competing political advertising platform at Powers Interactive. By taking advantage of the confidential information to which they had access at Altice, and by recruiting the Other Former-Altice Employees and Consultant, the Individual Defendants were able to hit the ground running and fast-track the establishment of Powers Interactive to the detriment of Altice.

## COUNT I

### COPYRIGHT INFRINGEMENT – 17 U.S.C. § 101 *ET SEQ.*
[All Defendants]

190.   Plaintiffs repeat and re-allege the allegations contained in Paragraphs 1 through 189 as if fully set forth herein.

191.   CSC Holdings is the owner of a valid copyright in and to the Altice Order Terms. The document is original to CSC Holdings and is copyrightable subject matter under the U.S. Copyright Act, 17 U.S.C. § 101, *et seq.*

192.    The Altice Order Terms are the subject of U.S. Copyright Registration No. TX 9-283-913. *See* Exhibit 1.

193.    Defendants copied the original, protectable elements of the Altice Order Terms.

194.    Defendants had access to the Altice Order Terms as a result of, among other things, Montemayor's involvement with the drafting and publication of the document on behalf of Altice, all three Individual Defendants' former employment with Altice and use of the document with Altice customers, and the fact that Altice made the document available to its employees and customers online.

195.    Defendants infringed the Altice Order Terms by reproducing, displaying, and distributing an Order Terms and Conditions document that is substantially similar to and copied and/or derived from the copyrightable elements of the Altice Order Terms without CSC Holdings' authorization, in violation of its rights under the U.S. Copyright Act.

196.    Defendants engaged in such activity intentionally and despite notice of CSC Holdings' copyright for the specific purpose of infringing on CSC Holdings' copyright and deriving unlawful benefits therefrom.

197.    Defendants' copyright infringement has caused and will continue to cause substantial damages to CSC Holdings. Upon information and belief, without a permanent injunction, Defendants intend to continue their willful infringement of the Altice Order Terms.

198.    By reason of Defendants' intentional and willful copyright infringement of the Altice Order Terms, CSC Holdings has been and will continue to be irreparably harmed unless Defendants are permanently enjoined from their unlawful conduct.

199.    CSC Holdings has been damaged by Defendants' acts alleged herein in an amount to be determined at trial.

200.     As a result of Defendants' copyright infringement, Defendants obtained gains and profits that Defendants would not otherwise have realized. Altice is entitled to disgorgement of Defendants' profits attributable to their infringement.

201.     CSC Holdings has no adequate remedy at law.

## COUNT II

### BREACH OF CONTRACT
### [Individual Defendants]

202.     Plaintiffs repeat and re-allege the allegations contained in Paragraphs 1 through 201 as if fully set forth herein.

203.     The Individual Defendants executed agreements pursuant to which they agreed not to become involved with any business that competes with Altice for the periods of time and on the terms alleged herein.

204.     The Individual Defendants executed agreements pursuant to which they agreed not to solicit customers, employees, or consultants of Altice, as the case may be, for the periods of time and on the terms alleged herein.

205.     The Individual Defendants executed agreements pursuant to which they agreed not to disclose confidential, proprietary or trade secret information belonging to Altice on the terms alleged in herein.

206.     The Individual Defendants have breached those agreements by, among other things, competing with Altice in the advertising and analytics space, soliciting actual and potential customers of Altice, soliciting employees and consultants of Altice, and disclosing or using confidential or proprietary information belonging to Altice, as described herein.

207.     As a result of these breaches, Altice has sustained damages in an amount to be proven at trial.

208.    As a result of these breaches, Altice has been deprived of the benefit of its bargain with the Individual Defendants. Altice has suffered, and continues to suffer, damages and irreparable harm, including, but not limited to, the loss of business, loss of goodwill, and other damages for which there is no adequate remedy at law.

**COUNT III**

**<u>TORTIOUS INTERFERENCE WITH CONTRACT</u>**
**[All Defendants]**

209.    Plaintiffs repeat and re-allege the allegations contained in Paragraphs 1 through 208 as if fully set forth herein.

210.    The Individual Defendants and the Other Former-Altice Employees and Consultant executed agreements pursuant to which they agreed not to become involved with any business that competes with Altice for the periods of time and on the terms alleged in herein.

211.    The Individual Defendants and the Other Former-Altice Employees and Consultant executed agreements pursuant to which they agreed not to solicit customers or employees of Altice, as the case may be, for the periods of time and on the terms alleged in herein.

212.    The Individual Defendants and the Other Former-Altice Employees and Consultant executed agreements pursuant to which they agreed not to disclose confidential or proprietary information belonging to Altice on the terms alleged in herein.

213.    Upon information and belief, at the time Powers Interactive hired the Individual Defendants and the Other Former-Altice Employees and Consultant, it was aware of their employment with Altice and the existence and terms of their agreements with Altice.

214.    Powers Interactive has interfered with Altice's contractual relationships with the Individual Defendants and the Other Former-Altice Employees and Consultant by employing

them in positions in which they compete with Altice, solicit customers and employees of Altice, or disclose or use confidential and proprietary information belonging to Altice. Through its actions, Powers Interactive has induced the Individual Defendants and the Other Former-Altice Employees and Consultant to breach their agreements with Altice.

215.    Upon information and belief, the Individual Defendants solicited the Other Former-Altice Employees and Consultant to resign from Altice and become employed by Powers Interactive. Also upon information and belief, the Individual Defendants were aware, at that time, of the existence and terms of the agreements between Altice and the Other Former-Altice Employees and Consultant.

216.    The Individual Defendants have interfered with Altice's contractual relationships with the Other Former-Altice Employees and Consultant by recruiting them to work in positions in which they compete with Altice, solicit customers and employees of Altice, or disclose or use confidential and proprietary information belonging to Altice. Through their actions, the Individual Defendants have induced the Other Former-Altice Employees and Consultant to breach their agreements with Altice.

217.    Such interference by Defendants was wrongful and not motivated by a legitimate business purpose, and was intended to give Defendants an unfair competitive advantage.

218.    The foregoing conduct constitutes tortious interference with Altice's contractual relationships. Altice has been damaged as a result of such conduct, and is entitled to monetary damages and injunctive relief to address such past and ongoing conduct, in an amount to be determined at trial.

219.    Defendants' tortious interference with Altice's contracts was malicious, willful, and/or wanton, for which Altice is entitled to punitive damages.

## COUNT IV

### <u>UNJUST ENRICHMENT</u>
### [All Defendants]

220.    Plaintiffs repeat and re-allege the allegations contained in Paragraphs 1 through 219 as if fully set forth herein.

221.    The Individual Defendants and Powers Interactive have been unjustly enriched and have benefitted as a result of the Individual Defendants' wrongful disclosure of confidential and proprietary information belonging to Altice, and the Individual Defendants' and Powers Interactive's wrongful use of such information, *see* ¶¶ 6, 32, 33, 176-189, *supra*.

222.    While employed by Altice, the Individual Defendants received the benefit of learning confidential and proprietary information about customer preferences and utilization; customer spend history and billing information; CPM rates and mid-campaign adjustments; the terms of Altice's contracts with customers and third-party data vendors; mixes of products used for campaign execution; audience segmentation strategies; media strategies; sources of data used to develop audience segmentation and media strategies; DSP utilization and relationships; and post-campaign analytics and reporting. Such information helps Altice employees solicit new business and maintain Altice's existing accounts.

223.    The Individual Defendants have confidential and proprietary information belonging to Altice that have allowed the Individual Defendants and Powers Interactive to gain an undue and unfair advantage over Altice in a highly competitive market.

224.    The Individual Defendants are being compensated by Powers Interactive for the knowledge they gained under Altice's employ, and, upon information and belief, the confidential and proprietary information of Altice that the Individual Defendants have disclosed and used for the purpose of competing with Altice.

225.     Upon information and belief, the Individual Defendants also receive financial awards or bonuses for hitting sales targets at Powers Interactive. Upon information and belief, the Individual Defendants are using confidential and proprietary information of Altice to target customers of Altice, and boost their sales.

226.     Accordingly, the Individual Defendants' compensation from Powers Interactive, which stems from the unlawful and improper conduct described herein, has unjustly enriched and will continue to unjustly enrich the Individual Defendants to the detriment and harm of Altice.

227.     Accordingly, as a matter of equity, the Individual Defendants should be required to disgorge any and all income and financial awards or bonuses resulting from the improper and unlawful conduct alleged here and to reimburse Altice in an amount equal to the Individual Defendants' unjust enrichment.

228.     Upon information and belief, Powers Interactive has been and will continue to be unjustly enriched by receiving and using the confidential and proprietary information of Altice as alleged herein, to the detriment and harm of Altice. Accordingly, as a matter of equity, Powers Interactive should be required to disgorge any and all revenue and profit received from winning business in which the confidential and proprietary information of Altice was used to provide Powers Interactive an unfair advantage.

## COUNT V

## BREACH OF FIDUCIARY DUTY
### [Montemayor]

229.     Altice repeats and re-alleges the allegations contained in Paragraphs 1 through 228 as if fully set forth herein.

230.     Montemayor owed Altice fiduciary duties of loyalty and care on account of her position as legal counsel and business advisor.

231.    As a fiduciary, Montemayor owed Altice duties of good faith, fidelity, and full disclosure, and was not permitted to engage in simultaneous representation of adverse interests or otherwise engage in transactions that resulted in conflicts of interests.

232.    Montemayor breached her fiduciary duties of loyalty and care by, among other things, (i) failing to disclose to Altice her involvement with Powers Interactive and the Individual Defendants, who were employed by or working on behalf of Powers Interactive; (ii) advising Powers Interactive, the Individual Defendants, and the Other Former-Altice Employees and Consultant on matters related to the competitive business of Powers Interactive; (iii) advising the Individual Defendants and Other Former-Altice Employees and Consultant on matters related to their contractual obligations to Altice; and (iv) using confidential and proprietary information and documents belonging to Altice in order to benefit the competitive business of Powers Interactive—all to the detriment of Altice.

233.    Montemayor's conduct was not taken in good faith, was not entirely fair, and was the result of gross negligence and willful misconduct.

234.    Through the misconduct described above, Montemayor has breached her fiduciary duties to Altice, causing damages in an amount to be proven at trial.

**WHEREFORE**, plaintiffs ALTICE USA, INC., CSC HOLDINGS, LLC, and a4 MEDIA, LLC demand judgment in their favor and against defendants DAVID POWERS, JORDAN LIEBERMAN, LINDA MONTEMAYOR and POWERS INTERACTIVE DIGITAL LLC as follows:

(a) Granting a preliminary and permanent injunction enjoining and restraining each Defendant, each Defendant's agents, servants, employees, licensees, sponsors, associates, and attorneys, and any person acting by, through, or in active concert with any Defendant from (i)

48

directly or indirectly infringing on the Altice Order Terms; (ii) marketing, distributing, offering, selling, disposing of, licensing, leasing, transferring, displaying, advertising, reproducing, developing or manufacturing the Altice Order Terms and any works that copy, are derived from, or otherwise embody the Altice Order Terms; or (iii) directing, participating, or assisting in any activity prohibited by sub-sections (a)(i)-(ii).

(b) Awarding CSC Holdings (i) actual damages suffered by CSC Holdings as a result of Defendants' copyright infringement; and (ii) any of Defendants' profits that are attributable to Defendants' infringing conduct that are not taken into account in computing actual damages, as provided by 17 U.S.C. § 504(b).

(c) Granting a preliminary and permanent injunction enjoining and restraining each Individual Defendant from violating the restrictive covenant obligations contained in his or her agreement(s) with Altice.

(d) Granting a preliminary and permanent injunction enjoining and restraining Powers Interactive from tortuously interfering with Altice's contractual rights under its agreements with the Individual Defendants.

(e) Granting a preliminary and permanent injunction enjoining and restraining each Defendant from tortuously interfering with Altice's contractual rights under its agreements with the Other Former-Altice Employees and Consultant.

(f) Awarding compensatory damages to Plaintiffs in an amount to be proven at trial;

(g) Ordering an accounting of monies obtained through Defendants' wrongful acts;

(h) Ordering disgorgement of the monies obtained through Defendants' wrongful acts;

(i) Awarding Plaintiffs' actual costs, expenses and reasonable attorney's fees incurred in connection with this action;

(j) Awarding applicable interest to Plaintiffs on any judgment; and

(k) Awarding such other and further relief as this Court may deem just and appropriate.

## JURY DEMAND

Wherefore Plaintiffs demand a trial by jury on the within causes of action.

Dated:      New York, New York
            August 25, 2023

                              KELLEY DRYE & WARREN LLP


                              By: /s/ Barbara E. Hoey
                                  Barbara E. Hoey
                                  3 World Trade Center
                                  175 Greenwich Street
                                  New York, New York 10007
                                  Telephone: (212) 808-7800
                                  Facsimile: (212) 808-7897
                                  bhoey@kelleydrye.com

                                  *Attorney for Plaintiff*